**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOCELYN MCLEAN,                                    :

                Plaintiff,           :

                   v.                :    Civil Action No.: _3:22cv033-MPM_-JMV

FORMER MISSISSIPPI DEPUTY CHIEF        :    JURY DEMANDED
MEDICAL EXAMINER J. BRENT DAVIS,
M.D.; FORMER MISSISSIPPI CHIEF            :
MEDICAL EXAMINER MARK
LEVAUGHN, M.D.; FORMER MISSISSIPPI  :
DEPUTY MEDICAL EXAMINER LIAM
FUNTE, M.D., PH.D. (f/k/a LISA FUNTE);       :
TALLAHATCHIE COUNTY CORONER
GINGER MERIWETHER; TALLAHATCHIE
COUNTY, MISSISSIPPI; AND MISSISSIPPI
BUREAU OF INVESTIGATION SPECIAL
AGENT JOSEPH MAUNEY,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

In September 2016, Jocelyn McLean (hereinafter, "Ms. McLean" or "Plaintiff")
prematurely gave birth to a daughter, Emberly McLean-Bernard. Emberly was released from the
University of Mississippi Medical Center six days after she was born, but her mother rushed her
the next day to the Tallahatchie General Hospital, near where they were staying, because she was
not eating, she was unable to hold any food she did eat, and she was gasping for breath. After
diagnosing Emberly with acute respiratory distress, medical personnel spent the next four hours
trying to save her with heroic medical interventions. In the midst of these efforts, they contacted
Le Bonheur Children's Hospital in Memphis to airlift Emberly there. When the Le Bonheur

flight team arrived, they joined the emergency intervention effort. But their efforts were in vain and Emberly died at the Tallahatchie General Hospital four hours after her arrival.

That was not the end of the tragedy. The devastation suffered by her mother, Jocelyn McLean, was compounded when Ms. McLean, the mother of three other children, was later arrested and held in jail for nearly a year because the Mississippi Medical Examiner's Office falsely claimed that Emberly's death was a homicide caused by "[b]lunt force injuries with features of strangulation." This claim was made on the official autopsy report by Defendant Dr. Davis, reviewed and approved by Defendants Dr. LeVaughn and Dr. Funte, and repeated on the amended death certificate by Defendant Meriwether—despite the fact that Emberly's body and the medical records of her short life clearly demonstrated that all the injuries on her body were the result not of a homicide stemming from child abuse, but the extensive efforts by medical personnel to save her life as she died from natural causes.

Dr. Davis eventually had to admit the truth and recant his false claim of homicide four days before Ms. McLean was to go to trial on the charge of murdering her newborn baby. Once he admitted there was no homicide, and that the injuries he observed were all consistent with the life-saving interventions of the medical team, the charge was dismissed, but only after Ms. McLean had spent two-and-a-half years under the cloud of that capital murder indictment, nearly a year of which was in pretrial detention in the Tallahatchie County Correctional Facility, all the while facing the terrifying prospect of being sentenced to life in prison.

In addition, prior to her arrest and detention Ms. McLean was also subjected to an interview by Defendant Joseph Mauney, an agent of the Mississippi Bureau of Investigation, who accused her of committing, or allowing someone else to commit, a sexual assault of her newborn daughter even though there was no basis for him to make that outrageous claim.

2

The extensive medical interventions by hospital personnel to save Emberly's life were obvious to Dr. Davis when he conducted the autopsy the day after she died. He specifically noted in his autopsy report that she had a catheter in her leg, an endotracheal tube in her mouth, bandages on her neck and forehead, electrocardiograph ("EKG") pads on her body, and gauze taped to her arm. But Dr. Davis failed to follow basic professional standards requiring consideration, evaluation, and reporting of the immediate medical history and accompanying hospital records leading up to her death by natural causes. Despite his awareness of these medical records, Dr. Davis intentionally omitted any reference to them in his autopsy report.

When Dr. Davis finally recanted his claim of homicide just four days before Ms. McLean's capital murder trial and years after the autopsy itself, Dr. Davis claimed he had just seen the hospital records for the first time. That appears to have been false, and in any event Dr. Davis clearly knew from the equipment and dressings on Emberly's body during the autopsy that she had been in the hospital and that extensive interventions occurred. But instead of accounting for and reporting what was in the hospital records, Dr. Davis fabricated a claim that Emberly died from "[b]lunt force injuries with features of strangulation." His colleagues, Dr. LeVaughn and Dr. Funte, as well as Coroner Meriweither, concurred in that fabricated conclusion even though they also knew of the interventions from Dr. Davis's description of the body in the autopsy report, and even though there was no mention in the report of the requisite review of the hospital records, nor any mention of the obvious connection between the equipment and dressings on the newborn at the autopsy and each and every mark on the newborn's body. This was an intentional fabrication by these Defendants, as part of a false and misleading scientific report that led to the wrongful detention and prosecution of Ms. McLean for a crime that never occurred. As a result of these egregious acts of misconduct, Ms. McLean was wrongfully

3

incarcerated for nearly a year, wrenched away from her family and her children, and forced to endure the grief and trauma of losing her newborn daughter—all while contending with the groundless charge of capital murder for that newborn's death.

Ms. McLean therefore files this Complaint raising claims under 42 U.S.C. § 1983 based on (i) violations of her right to due process under the Fourteenth Amendment to the United States Constitution, including the creation of false and fabricated evidence stemming from a grossly inadequate and reckless medical investigation that deliberately ignored dispositive exculpatory evidence; and (ii) violations of her right to be free from false arrest without probable cause under the Fourth Amendment to the United States Constitution. Ms. McLean also asserts state law claims for malicious prosecution and intentional infliction of emotional distress based on the shocking conduct by Defendants. But for Defendants' unconstitutional and unlawful actions, Ms. McLean would never have been arrested, jailed, or prosecuted. Ms. McLean requests a jury trial on all causes of action so triable.

In support of these claims, Ms. McLean shows as follows:

## THE PARTIES

1.      Plaintiff Jocelyn McLean is the mother of four children, including Emberly, whose death was the beginning of the tragic series of events described in this Complaint. Prior to and since the incidents in question, Ms. McLean has had an unblemished record, with no felony criminal record and no history of violent acts. Ms. McLean is African-American.

2.      Defendant J. Brent Davis, M.D., is the former Deputy Chief Medical Examiner of Mississippi. He served in that position at the time that he performed the autopsy and authored the autopsy report in this case. He is board-certified by the American Board of Pathology in

4

Anatomic, Clinical, and Forensic Pathology. At all times described herein, Dr. Davis was acting under color of law. He is sued in his individual capacity.

3.     Defendant Mark LeVaughn, M.D., is the former Chief Medical Examiner of Mississippi. He served in that position at the time he reviewed and concurred with the autopsy report in this case, and was the supervisor responsible for oversight and management of the actions of the employees of the Mississippi Medical Examiner's Office. He is board-certified by the American Board of Pathology in Anatomic and Forensic Pathology. At all times described herein, Dr. LeVaughn was acting under color of law. He is sued in his individual capacity.

4.     Defendant Liam Funte, M.D., Ph.D. (f/k/a Lisa Funte), is a former Mississippi Deputy Medical Examiner. He held that position at the time he reviewed and concurred with autopsy report in this case. He is board-certified by the American Board of Pathology and a member of the College of American Pathologists. At all times described herein, Dr. Funte was acting under color of law. He is sued in his individual capacity.

5.     Defendant Ginger Meriwether is the elected Coroner of Tallahatchie County, Mississippi and held that position at the time of the events described in this Complaint. At all times described herein, Coroner Meriwether was acting under color of law and was the final policymaker for Tallahatchie County with respect to all of her actions described in this Complaint. She is sued in her individual capacity and in her official capacity.

6.     Defendant Tallahatchie County, Mississippi is a local governmental entity with the capacity to sue and be sued. At all times described herein, Coroner Ginger Meriwether was the final policymaker for Tallahatchie County.

7.     Defendant Joseph Mauney was a Special Agent for the Mississippi Bureau of Investigation ("MBI") at the time that he interviewed Plaintiff Jocelyn McLean, as described in

5

this Complaint.  In engaging in the conduct alleged in this Complaint, Agent Mauney acted under color of law.  He is sued in his individual capacity.

8.      All Defendants are liable to Ms. McLean for compensatory damages, and the individual Defendants are liable to Ms. McLean for punitive damages for claims brought against them in their individual capacities.

## JURISDICTION

9.      This action is brought pursuant to 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments to the United States Constitution.

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.  In addition, Plaintiff invokes supplemental jurisdiction over claims brought under state law pursuant to 28 U.S.C. § 1367.

## VENUE

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims asserted herein occurred therein.

## FACTUAL ALLEGATIONS

12.     On September 13, 2016, Ms. McLean went into labor prematurely.  Shortly after midnight on September 14, 2016, Ms. McLean gave birth by emergency Caesarean section to her daughter, Emberly McLean-Bernard, at the University of Mississippi Medical Center.  Emberly is referred to in the judicial proceedings and medical records discussed below as Emberly McLean, although her name appears as Emberly McLean-Bernard on her death certificate.

13.     At birth, Emberly weighed only 5 lbs. 2 oz., and suffered from jaundice.  Ms. McLean was discharged from the hospital after three days, but Emberly remained at the hospital because she was having difficulty feeding.

14.     On September 20, 2016, Emberly, who still had jaundice, was discharged by the hospital and brought home by Ms. McLean.  Once home, Ms. McLean treated Emberly's diaper rash that she developed in the hospital.  Emberly continued to have difficulty drinking milk from her bottle, was not retaining it, and was suffering from diarrhea.  Those symptoms are consistent with a viral infection.  As discussed below, post-mortem testing of a viral culture submitted by Dr. Davis confirmed that Emberly in fact suffered from a virus at the time of her death.

15.     On September 21, 2016 at 8:20 p.m., alarmed by Emberly's failure to eat, paleness, and her gasping for breath, Ms. McLean rushed Emberly to the nearest emergency room at Tallahatchie General Hospital.  Emberly had only been away from a hospital for one night.

16.     At that time, despite being a week old, Emberly weighed less than five pounds.

17.     After diagnosing Emberly with acute respiratory distress, medical staff in the Tallahatchie General Hospital emergency room attempted numerous medical interventions, including cardiopulmonary resuscitation ("CPR"), insertion of a breathing tube, and administration of intravenous fluids and medication, but Emberly's condition continued to deteriorate.

18.     The medical staff at Tallahatchie General Hospital then determined that Emberly needed to be airlifted to Memphis Le Bonheur Children's Hospital.  At 10:20 p.m., the flight team from Memphis Le Bonheur Children's Hospital arrived and immediately attempted additional emergency medical interventions, including multiple attempts at resuscitation by CPR,

7

the insertion of an endotracheal tube for breathing, the insertion of numerous intravenous tubes into Emberly's neck, scalp, and tibia for intravenous delivery of medicine, EKG tests, and repeated rectal body temperature checks.

19.     At 12:15 a.m. on September 22, 2016, four hours after arriving at Tallahatchie General Hospital and two hours after being treated by the Memphis-based flight team, Emberly coded and passed away.  She was still at Tallahatchie General Hospital.  She had spent just 36 hours of her life outside of a hospital.

20.     Immediately after Emberly's death, the Medical Examiner's Office was notified. The medical staff at Tallahatchie General Hospital prepared Emberly's body for the Medical Examiner's Office in accordance with all applicable policies and practices, with all therapeutic puncture sites marked, and with all medical tubes, lines, and dressings left in place.  At 1:25 a.m. on September 22, Emberly's body was transferred to the Tallahatchie County Coroner and was personally picked up by Coroner Meriwether, at which time she was given full access to the attending doctors and was provided with copies of Emberly's medical records.

21.     Among other things, Emberly's medical records painstakingly detailed the emergency medical interventions that were used to try to save Emberly's life, from the time she was admitted to the hospital on September 21, 2016, to the time of her death.

22.     Coroner Meriwether personally examined Emberly's body and observed the clear physical evidence of numerous invasive and traumatic life-saving procedures that had been performed on Emberly by medical personnel.  She also interviewed some or all of the medical personnel responsible for the multiple medical interventions.  Coroner Meriwether documented Emberly's condition photographically, and attached that documentation to her report.

23.     The Centers for Disease Control and Prevention ("CDC") has promulgated a Sudden Unexplained Infant Death Investigation ("SUIDI") Reporting Form prescribing the investigation that must be conducted and information that must be obtained and reported in the event of the sudden death of an infant.  Upon information and belief, the SUIDI form is part of the mandatory protocol followed by Tallahatchie County Coroner's Office and the Mississippi Medical Examiner's Office in the event of a sudden infant death.  Yet, despite knowing that she needed to comply with this protocol, Coroner Meriwether deliberately failed to comply with the protocol set forth in the SUIDI form, and chose not to complete nearly half of the eight-page form, including the sections of the SUIDI form requiring reporting of Emberly's lifetime medical history and medical history from the previous 72 hours.

24.     According to CDC instructions, the Infant History section of the SUIDI form should be completed by "the person investigating the infant death," which those instructions identify as including "coroner, death scene investigator, law enforcement, or medical examiner."

25.     The SUIDI form contains key questions that "medical examiners should ask before an autopsy is done," including questions about the infant's medical record and information obtained from the infant's health care provider.

26.     On October 17, 2016, Coroner Meriwether issued a death certificate for Emberly, with the cause and manner of death listed as "Pending Autopsy."

27.     On September 23, 2016, Emberly was transferred to the Medical Examiner's Office for an autopsy, where the case was assigned to Defendant Dr. Davis.  He conducted the autopsy that day in the Medical Examiner's Office.  As Dr. Davis noted in his autopsy report, Emberly's body arrived with a "catheter in [her] lower left leg," an "endotracheal tube in [her]

mouth," "bandage[s] on [her] right neck and forehead . . . [e]lectrocardiograph pads . . . on [her] torso and extremities," and "[g]auze . . . taped to [her] left arm."

28.     Dr. Davis also recorded observing hemorrhages and/or abrasions in both sides of the neck, the head, the rectum, and in the perineal soft tissue.

29.     These observed injuries were the direct result of the three intravenous lines placed by emergency medical staff in both sides of Emberly's neck and scalp, and the trauma to the rectum was the result of Emberly's temperature being repeatedly taken with a rectal thermometer.

30.     Dr. Davis obtained specimens for toxicological analysis that were negative. However, a sample from Emberly that was sent out for a viral culture was positive, indicating that she had a viral infection at the time of her death and suggesting that a viral infection may have contributed to her death.

31.     Dr. Davis deliberately disregarded his own observations of how Emberly presented at the autopsy, and deliberately disregarded Emberly's medical records from her emergency delivery, from the emergency lifesaving efforts during the hours prior to her death, and of the positive viral culture.

32.     Dr. Davis intentionally disregarded the obvious and extensive physical evidence on Emberly's body showing extreme, recent, emergency medical interventions that he saw himself and that was documented extensively in the photographic record that he received.  That deliberately ignored evidence would have accounted for each and every bruise and mark on the newborn's body.  Additionally, Dr. Davis intentionally disregarded Coroner Meriwether's statement on the first page of the medical examiner's file specifically noting that the bruising to the chest was caused by chest compressions performed by medical staff.

33. Dr. Davis did not complete the investigative steps mandated by the SUIDI form, or ensure that the SUIDI form had been completed.

34. According to the National Association of Medical Examiners ("NAME") standards, "[i]nterpretations and opinions [of forensic pathologists] must be formulated only after consideration of available information and only after all necessary information has been obtained."

35. NAME standards also require that forensic pathologists review relevant medical records, investigative reports, and medications in conducting autopsies and document any evidence of medical or surgical intervention of the deceased.

36. Defendants Dr. Davis, Dr. LeVaughn, and Dr. Funte are all board-certified in forensic pathology, had training in the basic and fundamental principles of forensic pathology and would have been familiar with the foregoing NAME standards at the time of their involvement in this matter.

37. In performing his autopsy, Dr. Davis intentionally ignored the basic and fundamental principles of forensic pathology and the foregoing autopsy standards promulgated by NAME.

38. The Medical Examiner's Office did not finalize Emberly's autopsy report until November 29, 2017, over fourteen months after the autopsy. In the face of incontrovertible physical evidence of multiple medical interventions that were in fact responsible for every mark on the newborn's body—which was clear from Emberly's body when the autopsy was conducted, and which was corroborated by Emberly's extensive medical records—Dr. Davis nevertheless claimed that Emberly's injuries were the result of "[b]lunt force injuries with features of strangulation," rather than the extensive medical interventions. What he called

"features of strangulation" were the red marks on Emberly's neck created by intravenous lines inserted on both sides of her neck, and what he called "[b]lunt force injuries" were the consequence of an intravenous line inserted on her scalp and the multiple insertions of a rectal thermometer to repeatedly check her temperature. Dr. Davis falsely stated that the manner of death was homicide.

39.     On December 1, 2017, Chief Medical Examiner Dr. LeVaughn and Deputy Medical Examiner Dr. Funte signed off on Emberly's autopsy report in total agreement with Dr. Davis's conclusions. They could only have done so by intentionally disregarding the physical evidence of medical intervention on her body, which was described in the report and documented in photographs of her body, and by intentionally disregarding the absence of any discussion in the report of records stemming from that obvious medical treatment she had received just prior to her death. Despite these clear warning signs, Dr. LeVaughn and Dr. Funte chose not to consider or inquire about the circumstances of that medical treatment and intervention or conduct any independent review of it. They also intentionally chose not to comply with the protocol prescribed by the SUIDI form, the NAME standards, and the other basic and fundamental principles of forensic pathology.

40.     Upon learning of the Medical Examiners' conclusion, Coroner Meriwether, who knew of Emberly's medical history and the signs of medical intervention on her body, contacted Dr. Davis and objected to that conclusion, pointing to the obvious evidence of the emergency medical interventions.

41.     Nonetheless, on January 11, 2018, knowing the falsity of the autopsy report, Coroner Meriwether signed and fabricated an Amendment to the Death Certificate, falsely certifying that the manner of death was blunt force injuries and characterizing the cause of death

12

as a homicide.  The Coroner erroneously wrote the date "1-11-16" beside her signature, although she actually signed that Amendment on January 11, 2018.

42.     In early 2019, the Medical Examiner's Office delivered the autopsy report to the District Attorney's Office.

43.     On February 20, 2019, MBI Agent Joey Mauney and Tallahatchie County Investigator Taranetta Harris interrogated Ms. McLean at a local law enforcement office in Georgia.  After Ms. McLean explained all of the events that transpired in the 24 hours preceding Emberly's death and the numerous attempts at medical intervention, Agent Mauney told Ms. McLean that "some things happened to [her] baby that [were]… not consistent with natural causes of a baby passing," and that her story didn't "quite match" what happened to Emberly. Agent Mauney then proceeded to make the shocking and outrageous claim that there was "tearing in [the baby's] rectum [that was] not consistent [as being] from a thermometer," and that it was "consistent with … a sexual assault."  There was no basis for that claim.  Even the false and deeply flawed autopsy report did not make that claim.

44.     During the interview, Agent Mauney repeatedly insinuated that Ms. McLean was responsible for Emberly's death, which Ms. McLean denied.

45.     On April 16, 2019, a Tallahatchie County grand jury indicted Ms. McLean for the capital murder of her daughter Emberly.

46.     Upon information and belief, the primary evidence presented to the grand jury was the falsified and scientifically inaccurate autopsy report.

47.     Shortly after Ms. McLean's indictment, the State of Mississippi sent an arrest warrant to be executed by Georgia-based law enforcement authorities.  A Georgia law enforcement officer contacted Ms. McLean and gave her the number of the Tallahatchie County

Sheriff's Office.  Ms. McLean called the Sheriff's Office to inform them of her intent to turn

herself in, arranged temporary care for her three young children, and drove to Mississippi to

surrender.

48.     On May 30, 2019, Ms. McLean surrendered.  She was then held in jail at the

Tallahatchie County Correctional Facility in Tutwiler, MS for nearly all of the next year.

49.     On June 19, 2019, Ms. McLean was formally arraigned.  In response to a request

for bail, the State referenced the fabricated and scientifically inaccurate autopsy report from the

Medical Examiner's Office.  Bail was denied and Ms. McLean remained in jail.

50.      A trial date of March 30, 2020 was postponed on March 16, 2020 due to the

COVID-19 pandemic.  Because of this delay, the court finally granted Ms. McLean's bail

application, but set bail at the significant sum of $250,000.

51.     Ms. McLean's family eventually raised enough money to pay a non-refundable

sum of $10,000 to a bail bond company, and the bail bond company then posted the $250,000

bond.  As a condition of her pre-trial release, Ms. McLean was also required to wear an ankle

monitor at her own expense of $350 per month.  Ms. McLean was released from detention on

April 23, 2020, after spending approximately eleven months in pre-trial detention.

52.     In or about July of 2020, Dr. Joye Carter, an independent, renowned medical

examiner, who is board-certified in Forensic Pathology, Anatomical Pathology, and Clinical

Pathology, reviewed Emberly's autopsy report as well as the relevant medical records.  After

reviewing those materials, Dr. Carter issued a report concluding that Emberly's death was not a

homicide, and that all indications of physical trauma on Emberly were explained by the medical

treatment performed during Emberly's extended time at the hospital.  Dr. Carter also concluded

that the Medical Examiner's Office failed to comply with NAME standards in conducting the

14

autopsy, failed to review records related to the medical interventions, and failed to conduct a thorough post-mortem examination.

53.    After she received Dr. Carter's report, defense counsel Tara Lang provided it to Assistant District Attorney ("ADA") Steve Jubera, who told her he would provide that report to Dr. Davis.  Ms. Lang did not hear back for more than a year, during which time Ms. McLean remained falsely accused of capital murder of her newborn daughter.

54.    In the interim, Ms. McLean's trial was continued again and was eventually scheduled to begin on October 11, 2021.

55.    On October 7, 2021, four days before trial was to commence, Dr. Davis recanted his original autopsy conclusion and declared for the first time that Emberly's cause of death was natural.  Specifically, Dr. Davis stated in writing that "the cause and manner of death is NOT blunt force injuries with features of strangulation."  Dr. Davis's recantation was an admission that no crime had been committed related to the tragic death of Emberly.  Dr. Davis also noted that the "insertion of vascular lines in the neck can cause hemorrhages" and that the "hemorrhages [he] saw at the autopsy [were] consistent with life-saving efforts."  He additionally noted that "the diaper rash and insertion of rectal thermometers could result in [the] abrasions and lacerations" that were observed on Emberly's body.

56.    Dr. Davis said he based his recantation on Emberly's medical records from Tallahatchie General Hospital and Memphis Le Bonheur Children's Hospital, which he described as "newly presented medical information" that he claimed he only received from ADA Jubera on October 1, 2021 and that he had never seen prior to that time.  Upon information and belief, Dr. Davis received Dr. Carter's report and the medical records from ADA Jubera long before October 1, 2021.  Those medical records had been in existence since Emberly died five

years earlier and had been in Defendants' possession and/or were easily available to them throughout the course of the investigation relating to Emberly's death, and were required to be considered as part of that investigation. As previously stated, Dr. Davis knew of the hospitalization and the medical interventions from his observation of the medical equipment and dressings on Emberly's body after she was delivered to his office, as well as from other information he received, which explained every single mark on Emberly's body. This included communications from Coroner Meriwether who confirmed on the first page of the medical examiner's file that the bruising on her chest was a result of chest compressions performed by emergency medical staff.

57. In light of Dr. Davis's belated recantation of his fabricated autopsy report, the October 11 trial was canceled, and on October 19, 2021, approximately two-and-a-half years after Ms. McLean was wrongfully arrested and put in jail, the capital murder charge against Ms. McLean was dropped and the case was officially dismissed with prejudice. These woefully delinquent actions did not erase the damage done to Ms. McLean.

58. As a result of the Defendants' actions as described in this Complaint, Plaintiff Jocelyn McLean was wrongfully arrested, detained, and prosecuted. The Defendants knew their actions would result in her arrest, detention, and prosecution. She suffered extensive damage, including but not limited to loss of liberty, wrongful separation from her three young children and family, severe mental anguish and emotional distress, and financial harm.

16

## CAUSES OF ACTION

### COUNT ONE

**Violation of the Fourteenth Amendment Brought Pursuant to § 1983 —Defendants DR. J. BRENT DAVIS, DR. MARK LEVAUGHN, DR. LIAM FUNTE (f/k/a DR. LISA FUNTE), in their individual capacities, and CORONER GINGER MERIWETHER, in her individual and official capacity, and TALLAHATCHIE COUNTY.**

59.     Plaintiff hereby repeats and realleges every allegation of the Complaint.

60.     As set forth in this Complaint, the actions of Defendants Davis, LeVaughn, and Funte in creating, approving, and authorizing a fabricated, false, misleading, and scientifically inaccurate autopsy report, and of Defendants Meriwether and Tallahatchie County (for whom Meriwether is a final policymaker) in creating a fabricated, false, misleading, and scientifically inaccurate amended death certificate, violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

61.     The fabricated report and the amended death certificate stemmed from a reckless and inadequate investigation by these Defendants that deliberately ignored exculpatory evidence.

62.     Their actions violated basic and minimal professional standards and violated the fundamental principles of forensic pathology.

63.     Their actions were intentional and were undertaken with deliberate indifference to, and in reckless disregard of, the right of Plaintiff Jocelyn McLean to be free from deprivations of liberty without due process of law under the Fourteenth Amendment.

### COUNT TWO

**Violation of the Fourth Amendment Brought Pursuant to § 1983 —DR. J. BRENT DAVIS, DR. MARK LEVAUGHN, DR. LIAM FUNTE (f/k/a DR. LISA FUNTE), in their individual capacities, and CORONER GINGER MERIWETHER, in her individual and official capacity, and TALLAHATCHIE COUNTY.**

64.     Plaintiff hereby repeats and realleges every allegation of the Complaint.

65.     As set forth in this Complaint, the actions of Defendants Davis, LeVaughn, and Funte in creating, approving, and authorizing a fabricated, false, misleading, and scientifically inaccurate autopsy report, and of Defendants Meriwether and Tallahatchie County (for whom Meriwether is a final policymaker) in creating a fabricated, false, misleading, and scientifically inaccurate amended death certificate, violated the Fourth Amendment to the United States Constitution.

66.     The autopsy report and the amended death certificate stemmed from a reckless and inadequate investigation by these Defendants that deliberately ignored exculpatory evidence.

67.     Their actions violated basic and minimal professional standards and violated fundamental principles of forensic pathology.

68.     Their actions were intentional and were undertaken with deliberate indifference to, and in reckless disregard of, the right of Plaintiff Jocelyn McLean to be free from false arrest and unreasonable seizures without probable cause under the Fourth Amendment.

## COUNT THREE

**Mississippi State Law Claim of Malicious Prosecution—Defendants DR. J. BRENT DAVIS, DR. MARK LEVAUGHN, and DR. LIAM FUNTE (f/k/a DR. LISA FUNTE), in their individual capacities.**

69.     Plaintiff hereby repeats and realleges every allegation of the Complaint.

70.     As set forth in this Complaint, the actions of Defendants Davis, LeVaughn, and Funte in creating, approving, and authorizing a fabricated, false, misleading, and scientifically inaccurate autopsy report constitute the tort of malicious prosecution under Mississippi law.

71.     The autopsy report and the amended death certificate stemmed from a reckless and inadequate investigation by these Defendants that deliberately ignored exculpatory evidence.

72.     Their actions violated basic and minimal professional standards and violated fundamental principles of forensic pathology.

73.     Their actions were intentional and malicious and were undertaken with deliberate indifference to, and in reckless disregard of, the right of Plaintiff Jocelyn McLean to be free from malicious prosecution under Mississippi law.

74.     There was no probable cause to support her arrest, detention, and prosecution, but probable cause was found as a result of the Defendants' improper actions, which were undertaken for purposes other than bringing an offender to justice.

## COUNT FOUR

**Mississippi State Law Claim of Intentional Infliction of Emotional Distress—Defendants DR. J. BRENT DAVIS, DR. MARK LEVAUGHN, DR. LIAM FUNTE (f/k/a DR. LISA FUNTE), and MBI SPECIAL AGENT JOEY MAUNEY, in their individual capacities.**

75.     Plaintiff hereby repeats and realleges every allegation of the Complaint.

76.     As set forth in this Complaint, the actions of Defendants Davis, LeVaughn, and Funte in creating, approving, and authorizing a fabricated, false, misleading, and scientifically inaccurate autopsy report constitute the tort of intentional infliction of emotional distress under Mississippi law.  The autopsy report and the amended death certificate stemmed from a reckless and inadequate investigation by these Defendants that deliberately ignored exculpatory evidence. Their actions violated basic and minimal professional standards, and violated fundamental principles of forensic pathology.

77.     As set forth in this Complaint, the actions of Defendant Mauney during his interview of the Plaintiff, including the portion in which he accused her of perpetrating or allowing a sexual assault on her newborn who was just a few days old, also constitute the tort of intentional infliction of emotional distress under Mississippi law.

19

78.     The actions of all of these Defendants were intentional, willful, wanton, malicious, outrageous, atrocious, extreme, revolting, indecent, and intolerable, and they violated the right of Plaintiff Jocelyn McLean to be free from intentional infliction of emotional distress under Mississippi law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and seeks relief from Defendants as follows:

(a)     Compensatory damages in an amount to be set by the jury;

(b)     Punitive damages against the individual Defendants in an amount to be set by the jury;

(c)     Reasonable attorneys' fees and all costs of these proceedings;

(d)     Pre-judgment and post-judgment interest; and

(e)     All other relief as may be just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff requests that all issues triable by a jury be so tried in this case.

Dated: February 18, 2022

Respectfully Submitted,

*s/ Robert B. McDuff*
ROBERT B. MCDUFF
Miss. Bar No. 2532
767 North Congress Street
Jackson MS  39202
(601) 259-8484
rbm@mcdufflaw.com

TARA LANG
T & G Lang Law Firm LLC
306 N. Market Street
Charleston MS  38921
(662) 783-5017
taralang@tglanglaw.com


PALOMA WU
Miss. Bar No. 105464
MISSISSIPPI CENTER FOR JUSTICE
5 Old River Pl., Ste 203
Jackson, MS 39202
(601) 709-0857
pwu@mscenterforjustice.org

*Counsel for Plaintiff Jocelyn McLean*